May it please the Court, Darren Janis on behalf of the Appellant Federal Home Loan Mortgage Corporation. I would like to begin by providing some context to the issue of subrogation in this case. Because Ms. Zepeda's loan is a home equity loan that is without personal recourse, if there is no subrogated lien, she will have no reason to continue paying her loan, even though it is undisputed that most of that loan was used to pay off a valid pre-existing lien on her property. Well, you may be too young to remember the old days of usury in Texas, but this happened with some frequency. If you messed up on usury as the lender, the person was free and clear, even though, yeah, they got the money and used it and whatever, and sometimes you ended up having to pay them in addition to them getting out of the loan. So the fact that she may be able to walk away from this loan, you know, if that's the effect of the law, it's the effect of the law, you know, penalties for not following the law. You're correct, Your Honor, and the Texas Constitution provides a similar remedy in that it invalidates the lien that secures that loan. However, subrogation steps in after the invalidation of that lien to preserve what was a valid existing lien on the property, and the Texas Supreme Court has said that that lien does not go away simply because it was paid off. In fact, it gives rise to subrogation rights in the lender who paid the loan. But the Texas Supreme Court has not addressed the specific argument about the ability to cure, and how does that interplay with the whole subrogation argument, right? And you're speaking of equitable subrogation, I believe, Your Honor. Well, I guess you can, okay. We have the argument about whether the contract as a whole is valid when it's got this invalidity to it, okay, and then we've got the issue of if it is invalid, then we have equitable subrogation. But on either score, we have this issue of ability to cure, which would affect contractual subrogation, because if I cure, then I got my contract back, right? That's correct. And then I don't need all this other stuff. I've got my contract. So am I correct that on neither front has the Texas Supreme Court addressed the effect of the cure provisions not being followed by the lender on the question of whether then the lender does forever forfeit all rights, or would continue to have some degree of rights, be they equitable or be they contractual? I believe that the LaSalle v. White case by the Texas Supreme Court does address that in the sense that the lien in that case was curable, and the lender did not cure, and the Supreme Court, nevertheless, said that the lender was equitably subrogated to the prior lien, and that case did not involve contractual subrogation. It only involved equitable subrogation, because that was all that the lender was requesting in that particular case, but I believe that that case does . . . Where . . . I'm sorry. Go ahead. But you'll agree that's significantly different, won't you? I mean, here you're talking about a contract, and you're telling me the only issue involved in the LaSalle was an equitable subrogation. That's correct, but in this case, Ms. Zepeda has only argued that the ability to cure affects equitable subrogation. She has not said that it affects contractual subrogation, and the Supreme Court in Benchmark Bank v. Crowder said that when there is an express agreement between the borrower and And that's really the problem. Okay, but where in LaSalle does it say, if there is a cure provision that you are given the opportunity to comply with but fail to, then there's still no subrogation? There is still a subrogation claim. Where does it say that? I didn't think it did. It does not explicitly say that, but it is implied, because the lien was curable. Well, my experience with appellate courts, and specifically courts of last resort, is they take cases to address specific issues. They don't sit around and go, you know, while we're here, let's find some issues no one's briefed and talk about them, too, and, in fact, get themselves in trouble if they do that, because they aren't briefed, and they may not realize what other issues might be presented by that. So they tend to stick to the issues before them, and we, in construing those opinions, aren't supposed to say, maybe you could construe that they thought they had subject matter jurisdiction. All right. They've got to have that. But I don't know that I can construe they thought of every possible defense that no one talked about and decided to address them sub salientio. I would agree with that, Your Honor. Okay. So we have to deal with this argument. Straight up, why didn't you all cure? I realize that y'all is the lender and you're Freddie Mac, but still, that seems like an easy cure. Could have signed the document. If I'm told you have to sign a document for it to be valid, and I want it to be valid, I'm done. Why was that not done? I think we would need to ask the original lender in Brace why they did not sign it when they responded to her notice. They would have been the one to sign that, as the original lender and one that was still in business. They obviously responded to her letter. We would have to ask that question to them. I don't know. Y'all never got any notice about it. Freddie Mac was also given the notice. I don't know why there was no response there. There's no indication in the record why there was no response. I think that in Brace's response shows that it may have been confused by exactly what she was acknowledging, and that that may have led to it not signing the acknowledgment. There's also, in the security instrument that she signed, she said that that acknowledgment had been signed by both her and the original lender. To directly answer your question, Judge Haynes, we just don't know from the record why it wasn't signed. We're not the ones creating the record. You all are. Were you prohibited from doing discovery to flesh out these issues? No, there could have been discovery. Okay. Because you're saying, we don't know, we don't know. I mean, I spent a good bit of my life doing discovery to answer questions I didn't know the answer to. And then people would tell me the answer. Didn't have to believe them, but I would get an answer. And if that wasn't done, then that falls on whoever's trying to set aside what the district court did, is the one who has to come forward with the evidence that shows they were wrong. And I'm not seeing that here, if you're saying, I don't know. Well, I think there's two things to keep in mind. First of all, we also don't know why the lender in LaSalle did not cure. It could have easily cured by disclaiming its lien on the agricultural use portion of the homestead. That cure would have been just as easy. We don't know why it didn't do that. The Texas Supreme Court was unfazed by the fact that the lender did not cure. The other thing to keep in mind is that subrogation only arises when there is an invalid uncured lien. If it's cured, you never get to subrogation. And the Texas Supreme Court has repeatedly said for a very, very long time that no courts of other states apply the doctrine of subrogation more than Texas does. How often does this situation arise? I mean, you represent Freddie Mac, so obviously you're a client anyway, maybe not you personally. Your client sees a lot of loans. How often does this particular violation take place? Is this a very unique case, or is this pretty commonplace? It is very often alleged. And we see the failure to sign the acknowledgment of fair market value alleged very regularly. In fact, what we get quite often, Your Honor, are notices from borrowers that basically list every single requirement under Section 50A6 and saying that all of them were violated. Even the one that says that the security instrument has to disclose that the loan is an extension of credit. And there it is right on the security instrument. So we get these all the time. Any idea why? Is it just sloppiness or ignorance of the law? I don't believe that that's the case. I think that there's a bar that a group of attorneys that send these out. And counsel, trial counsel, for miscipate in this case is one of the foremost in those. And it's a trap, in essence. They send out a notice to the lender that alleges everything under the sun in hopes that something slips through the cracks. Okay, but, you know, the lender is in a good position to deal with that. The reality is you've got these hyper-technical rules, okay? And the lender is the one charged with knowing them. Some ordinary person getting a home equity loan is not going to read all these rules. But the lender has every incentive to do it and should get it right in the first place. But if they don't and they're getting these and they're wise to the fact that there's these lawyers out there that are sending them these letters, then they should be responding. And if they aren't responding, they should have a reason. And so I guess I'm not really all that sympathetic about how y'all fall in some trap. This is your business, you and the lenders. This is your business. You know there are all these technical rules. I mean, I can remember when I closed on my house, I had to say that Katharina D. Haynes is the same person as Katharina J.H.D. Haynes and get that sworn to and all this or they wouldn't close on the house. So where was that coming from? I don't know, but okay, that's what they insisted on. There were all kinds of things you had to sign and rules and regulations and this and that. So I think Texas has the right to do that. It's how you even have a home equity loan industry in Texas is because of all these technical rules. What we're dealing with is not the propriety of the rules or the need to deal with them, but whether subrogation should even apply when you have been given the chance to cure, when something is curable and you've been expressly given the chance to cure, whether it's by a trapping lawyer or not. I agree that that's what we are dealing with. And when it comes to contractual subrogation, that is why that's in the contract because you often have situations like the one in this case where the current lender is not the same as the original lender. And there are some challenges to implementing some of the cures when you are not the original lender. For example, signing the Acknowledgement of Fair Market Value, as we have in this case. I'm just not fair with the challenges here. You told me you got notice, the same notice I guess Enbrace got, and just did nothing. I say you, Freddie Mac, just did nothing. And it seems to be, unless I'm misreading this, some constitutional requirement that these contracts are signed. Is that right? There is a requirement that the Acknowledgement of Fair Market Value be signed by the lender. Freddie Mac was not the original lender. Enbrace was. I hear that, but you told me you got notice that this document needed to be signed. We did. And just did nothing. So do we know what the Texas Supreme Court says when you get notice that you have an opportunity to cure and you do nothing, and as you stand here today, you don't even know why you did nothing? Is there a case that answers that? LaSalle answers that. LaSalle does not answer that. Those are the exact facts in LaSalle. The lender received notice. But they didn't raise that point. They did not raise the issue of the failure to cure. If they did, tell me where it is, because I didn't see it, okay? That issue, that specific issue, was not raised. Right. So there's not an answer. And if, in fact, Zepeda is right that the invalidation applies to the whole contract, you don't have a contractual separation. And if we're talking equities, it seems to me you all had the chance to fix it. That seemed kind of equitable and good enough. Having failed to do so, why should you get the benefit of the equities? Let me answer both of those questions, and I'll start with contractual separation. And the reason why there is contractual subrogation, despite any opportunity to cure or anything like that, is because in Benchmark versus Crowder, the Texas Supreme Court said that if the security instrument provides for subrogation, you are subrogated, period. And that cannot be reconciled in any way, shape, or form with the position that invalidation of the lien under the Constitution invalidates every provision in the instrument creating that lien. In fact, in Benchmark, the court went on to say that other provisions in that same instrument were also enforceable with regard to the foreclosure of the subrogated lien. So not only was the subrogation provision enforceable, despite the invalidity of the lien, but the foreclosure provisions were enforceable. There are other cases that find the same thing with regard to other provisions, and one very important one from the Texas Supreme Court recently is the Garofalo versus Aquin opinion, where it talked about the forfeiture remedy that's prescribed by Section 50A610 of the Constitution. The court said that that remedy can only be accessed through the forfeiture provision that has to be put in the security instrument. You've said that this issue arises with some frequency, if not a motivated scenario by certain lawyers, and it sounds to me like this is essentially an open question of Texas law. Each side's got their analogous cases. Any reason why we, from your perspective, any reason why we shouldn't certify this issue to the Texas Supreme Court and get a definitive answer for everybody? We would welcome certification to the Texas Supreme Court. However, I don't think that it's warranted here because, as the court recently reiterated in Trois versus Greenberg, the main factor is whether there is sufficient state law, particularly from the Supreme Court, to allow this court to make a reasonable or reasoned rather than a conjectured conclusion. I understand we have the authority to reach the issue. No question about that. I'm just asking, is there any particular problem or obstacle you would see to getting a definitive answer given the recurring nature of this question? I don't see any obstacle. I do think that the Texas Supreme Court has already provided the guidance that's needed in Benchmark, in Garofalo, in LaSalle, and also in Cone. I do want to — Your time. Sorry, the red light is up. Thank you. You have saved time for rebuttal, though. May it please the Court. The reason the Texas Constitution has detailed requirements for home equity loans is because these loans are notoriously risky. Now, lenders do not have to comply with the Texas Constitution. Constitutional compliance is only required for those lenders who would like to have their loan secured by a lien on the homestead, and because the consequences of noncompliance are so severe, the Texas Constitution affords these lenders grace. For lenders who fail to comply at the outset, they are entitled to notice of the defect in a 60-day deadline to go cure the defect and create a valid lien. What is at stake in this case is the careful balance of constitutional protections and incentives to incentivize constitutional compliance. And we would ask — But why do we have subrogation at all? If we've got this set up, then why would we not just say, if you don't cure, you're out? I think that's right. But they — but we know Texas does have subrogation. So how can you square those two principles, that you've got to do the cure or you're dead, with the fact that we know Texas does have subrogation in this context? Well, Judge Haynes, I think you are absolutely correct that the court has not addressed subrogation in this particular context of curable home equity liens. What about LaSalle? And so LaSalle is addressing a context where it was a lien on a property designated for agricultural use, and it is not accurate to say that that was a curable defect. It is true that there was one acre of the property in that case that was not designated for agricultural use, and so the lenders are correct to say the bank could have cured its lien with respect to one acre, but that's not what they were doing. They were seeking equitable subrogation of the entire property. And that's why the parties in the San Antonio Court of Appeals and in the Texas Supreme Court were not briefing cure rights and how cure rights would affect the analysis, because they weren't looking to cure. They were looking for equitable subrogation on the portion of the property that could not be cured. And so I think this Court is exactly right. That question has not been addressed by the Texas Supreme Court, and LaSalle does not . . . Is LaSalle certified? We are certainly not opposed to certification, but I don't think the Court needs to. And I recognize this Court has to be very judicious about its use of certified questions.  And so I think there's . . . Well, they have discretion on that. We don't . . . True, but they've never declined. They've been very gracious to us, I will say that, but it is in their discretion. It's in their discretion, and Judge Haynes, as I know you've written in Section 50 cases, it's oftentimes appropriate. But I don't think it's required or necessary in this case, because I do believe this Court has clear guidance from the Texas Supreme Court. And I would point particularly to LaSalle, but also to the most recent decisions from the Texas Supreme Court in the Wood and the Garofalo decisions. Wood made very clear that an uncured lien on the homestead is void. It's unenforceable. And that, by the way, answers the question in this case about contractual subrogation, because it is undisputed that the contractual subrogation provision in this case is in the void lien. You cannot enforce a void instrument. Well, they're arguing, if I understand it, that it really just voids that paragraph, if you will, the lien paragraph, and it doesn't void the rest of it. They've made that argument with respect to a severability provision, and we have briefed in our appellee's brief that that argument was waived in the district court. The district court held that it wasn't raised until the motion to alter or amend. He refused to consider it. And the . . . They have to have the severability clause to make the argument? I mean, what if there was no severability clause and you had an invalid lien in an otherwise valid document, i.e., people were mentally capable when they signed it, and so on and so forth, would you not be able to say just the lien is invalid? You would have to . . . I mean, is there no argument that could be made that you can sever without a severability? Correct. The instrument is void. And so you can't say, well, it's a void instrument, but we'll still enforce it like a contract. It is a security instrument that all the Texas Supreme Court cases discussing void liens are holding the instrument. The whole thing. The whole thing. And have they addressed this kind of issue where it's really an, I won't say unrelated paragraph, but it's not part of the lien? Because they're not trying to enforce the lien in that document. They're trying to enforce the lien in the 2007 document. Well, that's true, but what they're really trying to enforce is a contractual provision in the void lien that says that they're entitled to contractual subrogation. I mean, what if there was an arbitration clause in there? Would that be voided? I think the whole thing is voided. And part of the reason I say that is because of Wood, and if there are parts of Wood that talk about the security instrument is void, it's an instrument, not a provision in a contract. But to look at Garofalo, this decided the exact same day as Wood, the Texas Supreme Court was very clear to distinguish the loan from the lien. And it said when there's a void lien, the party's rights are all, have to be litigated in the context of the loan. The loan is still a valid contract. But if we affirm here, she can walk away, right? Right. That's correct. So this is reminiscent of the usury days of lore, lore to you, memory to me. I think that's a good analogy. I hadn't thought about usury, but it is true that the way that the Constitution is structured for these home equity lending provisions, that if lenders refuse to comply and refuse to cure, the consequence is that the lien is void. And in fact, homeowners under the Constitution can sue for forfeiture of principle and interest. That's a draconian remedy. That's the nature of all formality requirements, statute of frauds, what have you. Right. If the Texas Supreme Court wants that kind of strictness, that's so be it. That's why I asked the certification question, though, is, it appears to me that this case is a classic clash of two different doctrines, and we haven't gotten the resolution from the relevant body, the Texas Supreme Court, how we resolve this particular clash. Right. Well, I will tell you, if I were in the Texas Supreme Court right now, I would be arguing that you can't have segregation in the home equity lending context at all, because I think it is categorically inconsistent with the Constitution. And fair enough, I guess. So the question is, should you be arguing there or not here? I think you're making that argument for sure, because we can't overrule the Texas Supreme Court. Right. I mean, this court can't overrule us all, and so our position in this case is actually pretty modest. I mean, we're not saying you can't have segregation at all. We're saying only, well, first of all, we'd say, in the curable lien context, which has not been addressed, I think this court could say, the lenders have an adequate remedy at law, and where there is an adequate remedy at law, you don't get equitable remedies, period. That's just a bedrock principle of Texas common law. It's stated in LaSalle. But if this court wanted a softer position, it could say, in the curable lien context, at a minimum, that lenders have to exercise diligence in attempting to cure their lien under the Constitution. Well, let's talk about the exercise of diligence here. Is this a fact-finding, whether somebody was diligent? I mean, let's say, for example, that the evidence was, which I realize it's not, that M. Brace had a very strict policy about handling cures, and it was very laid out, you had weeks of training and all of that, but some hapless person got this letter and inadvertently threw it away. I mean, I know those aren't the facts here, but let's say that they did. Would that be the sort of thing that would allow for, kind of, equity to step in? Because they did everything, you know, they were diligent as a company, they trained everybody, but then they had someone who just had an emergency in their family and accidentally threw it away and therefore didn't cure. And again, I'm coming up with something that isn't the facts here, but. Yeah. Well, yes, I think that's a perfect example, and it is a fact-bound question. It has to be a fact-bound question. It's totality of the circumstances. You're looking at reasonableness, diligence, fault, negligence, good faith, all the things that go into equity, and what is missing in this case is any explanation for why the lenders didn't cure. So you're saying it's fact-bound, but there ain't no facts, so then the judge can resolve it straight up, doesn't have to. Well, there are facts. There are facts. Well, no, there aren't any disputed facts, any contrary facts, we'll put it that way. Or any relevant facts. I think that's right. You're making a categorical argument, not here, but in your hypothetical certified question. It was appropriate to decide in summary judgment, but there are facts that went into the district court's analysis. But was there a dispute? In other words, was there, the only thing they say is, well, we were confused or something like that in their response, so they wrote this response back. But is there a dispute about, actually, we wrote some other response, it just got lost in the mail or, you know, whatever? No, first of all, there's no dispute, and second, I appreciate counsel's concession that the record does not speak to why the lenders didn't cure. And what is missing in this case is some explanation. I could imagine a scenario where a lender with an affidavit in support of their summary judgment motion gives a good reason for why they didn't comply with the Constitution, and a district court could say they're entitled to equitable segregation. If they know there's these trapping lawyers out there, I don't know why they aren't prepared for the trapping lawyers. I mean, that's what you do, you know? If you've got a company that's fallen in traps, you stop running into the trap. You say, don't eat the bait. Let me take issue with that for just a minute, because I totally dispute that banks are getting trapped by enterprising lawyers. Lenders know exactly how to dot the I's and cross the T's. They have checkbooks. I'm using their... I know, I know, I know. I'm adopting their argument for purpose of challenging you. I'm not necessarily agreeing that y'all are trapping lawyers, but I don't think that's a negative. I mean, you know, you make a living. I mean, if you're doing it legitimately under the law, you know, that's how it goes, right? Yes, and I want the court to remember, these are not hyper-technical requirements. Well, they are, actually, but if that's the requirement, that's the requirement. And if a lawyer helps clients take advantage of that, again, in the world of usury in my day, back when I was a very young lawyer, that was, you know, fairly common. I know a lawyer who got out of his whole student loan, and they had to pay him for that. Judge Ho, the Texas Supreme Court had similar questions as you had about, you know, is this burdensome for lenders? And the Texas Supreme Court said in the Wood opinion that they don't consider these cure requirements burdensome. And so there is no reason lenders can't, if they're given notice that there's some defect in their loans, that they can't go back and fix it. They can't... They can sign the Acknowledgement of Fair Market Value, and that would have cured the lien in this case. And so, you know, I know the Court remembers in 2008, when this country faced the largest and most spectacular mortgage security crisis in this country's history, it was unprecedented because of the aggressive practices of lenders. And that led to the credit crisis, and it led to a worldwide financial crisis, and a $200 billion bailout of Freddie Mac and Fannie Mae. These constitutional provisions are against a backdrop of protecting homeowners from the kinds of aggressive practices that cause, or are much more likely to cause foreclosure. And did it seem like that in 2008? Excuse me? In Texas? Was Texas better off? Yes. Than the rest of the country? Yes. In fact, there are articles, New York Times, Washington Post, holding up Texas as a model for how the consumer protections in our Constitution actually saved Texans from the foreclosure rates that many other states experienced. In the subprime lending crisis, when many homeowners got underwater on their homes, it was partly because these types of loans had all sorts of exotic provisions in other states that made it far more likely that homeowners would face foreclosure. And so that's why in our Constitution we have this very detailed scheme, is where the Texans were learning the lessons from the 49 other states and going ahead and putting these protections in. Let's talk about Freddie Mac, because they're saying, well, we weren't the original lender, we couldn't have just picked this up and signed it, so what are we supposed to do? Would it be fair to say that they don't have to take the assignment, they don't have to buy this loan, they can review the documents, and if the documents are lacking a signature, could they have at that point asked for the signature? Yes. When they were doing the transfer, could they have said, hey, wait a minute, this one document doesn't have a signature? Yes. The notice went to both embrace the original lender and Freddie Mac. No, I mean when they originally bought the loan. Right. Oh, absolutely. They could have reviewed the documents under these same standards, they're well-known standards, and said this is missing and either not done the transaction or required them to fix it. That's a good point. Lenders do not have to wait to notice a defect or receive notice of a defect. They can proactively go ensure constitutional compliance. On the secondary mortgage market, when these lenders are buying up other loans, they can review the file. They can do their own checklist and say, we want to make sure these liens are valid before we buy the loan. There is nothing stopping them from curing at any point in time, but after the 60 days, the Constitution does set a deadline, and at that point, the remedy is to declare the lien void. Other questions? Okay. I think the Court has my arguments. If I could just briefly conclude, I think what's going on here is that Freddie Mac wants the Court to give it foreclosure rights, even though it hasn't complied with the Constitution and hasn't cured, and it is not the responsibility of the courts to subsidize predatory lending practices or substandard business practices. Under Texas law, lenders are masters of their own fate. They can choose to comply, they can choose to cure, but they don't get to sit back and do nothing and just rely on equity. This Court's opinion will shape behavior, and we would ask the Court to affirm the judgment because affirming will incentivize lenders to comply with the Constitution or at least diligently try to do so. Thank you. I at least know why they messed up. Hmm. Okay. Mr. Janus, your thoughts. Thank you, Your Honor. I'd like to address three things in rebuttal. First of all, with regard to equitable subrogation, all of the discussion about a cure or no cure all occurred years after this loan was made, and in Cohn v. Harper, the Texas Supreme Court, and also in Benchmark, it was very clear that subrogation rights arise as a matter of law when the loan is made, and you do not look at subsequent actions to determine whether a lender is subrogated or not, and that has been consistent. What about the severability issue on the contractual side, that we can't get to your contractual subrogation provision because you didn't raise severability in a timely fashion? As Your Honor pointed out, Judge Haynes, we don't need the severability clause in order to . . . Oh, I didn't say we didn't. I said, do we? You do not need the severability clause. Okay. And what case says that, that even without a severability clause, you can sever something that invalidates the contract from the rest of the contract? It's not a severability issue. It's in Benchmark v. Crowder, the court said that although the lien is invalid, provisions of that instrument are valid. Now, counsel is conflating the lien with the instrument in which it's created, and the plain language of Section 50C applies to liens. It says no mortgage, trusted, or other lien. So, it's describing different types of liens that are not valid. The Constitution only invalidates liens. It does not invalidate agreements. If there had been an arbitration agreement or provision in there, that would have been enforceable. The foreclosure provisions were enforceable, as we saw in Benchmark. In Garofalo, we see that the forfeiture provision is enforceable, despite the invalidity of the lien. If they're correct, and every provision in that security instrument is invalid, then borrowers would never be able to get forfeiture, as intended by the Texas Constitution, because that is a contractual provision in the security instrument that would be invalidated with the rest of it, under their theory. That cannot be what the drafters intended. So, and Wood has nothing to do with subrogation. It was about the statute of limitations on bringing these claims. The last thing that I want to address here is what counsel described as a delicate balance between the homestead protections in the Constitution and subrogation. And these really, as you read the Texas Supreme Court's opinions, do not conflict with each other. They harmonize with each other. The purpose of the Constitution is to ensure that only valid liens are on a homestead. That's the whole point. Here under 50A6, if you don't comply with the requirements, if you don't cure a defect, then that lien is gone. That lien is invalid. However, subrogation works with the Constitution to ensure that the valid lien that did exist on the property is preserved and that the borrower is not unjustly enriched by having that paid off for her benefit and not having to repay the money that she borrowed. So those two really work harmoniously. So how are lenders ever going to follow the law if they're kind of given these huge safety nets? Because there are still consequences to not curing. When you're subrogated, you are only subrogated to the amount of the pre-existing lien. So whatever you advanced as part of the new loan is gone. You don't recover that. So there is... So as you're saying, if it's a home equity that pays off the prior mortgage and also allows them to do renovations, then the renovation piece goes away. Correct. What's it like in a breach of contract case that violates statute of frauds, you still have unjust enrichment? Sorry, it's a weird analogy, I suppose, but if you have a contract that violates the statute of frauds, then you don't get the benefits of the contract, but you could theoretically sue an unjust enrichment. Correct. I think that's an apt analogy there. So and also a reason that lenders will want to cure is not only to preserve their lien and avoid losing that portion of their lien, but also simply to avoid litigation, which is very costly. Lenders don't like to be in court. I don't think anybody likes to be in court, and lenders are no different. We do believe that the Supreme Court has provided sufficient guidance, and we ask this Court to follow it. Thank you. Okay. Thank you. And I do want to say, I'm not suggesting that Texas usury laws have gone away. They've just, the kind of litigation we saw in the 80s has been altered over time by changes in laws and so on. So again, I didn't want anybody quoting me as there is no usury law in Texas. There is, but it's changed in some respects. Okay. So with that, we will take a 10-minute break. Thank you.